## DONNER v. SHEER PHARMACAL COR-PORATION.
### No. 9613.

Circuit Court of Appeals, Eighth Circuit.
March 20, 1933.

Rehearing Denied April 29, 1933.

Thomas H. Sheridan, of Chicago, Ill. (Lynn A. Williams, of Chicago, Ill., Taylor, Chasnoff & Willson, of St. Louis, Mo., and Williams, Bradbury, McCaleb & Hinkle, of Chicago, Ill., on the brief), for appellant.

Richard A. Jones, of St. Louis, Mo. (Edward J. Brennan, of St. Louis, Mo., on the brief), for appellee.

Before KENYON, GARDNER, and SANBORN, Circuit Judges.

SANBORN, Circuit Judge.

The parties will be referred to as in the court below; the appellant as plaintiff, and the appellee as defendant. The suit is for infringement of letters patent No. 1,379,855, granted to the plaintiff May 31, 1921, upon an application filed March 3, 1921, for a cream depilatory. The defenses are lack of invention, vagueness of description, and noninfringement. From the decree dismissing his complaint, the plaintiff appeals.

This patent was sustained by Judge Lindley in the case of Donner v. Walgreen Co. and Neet, Inc. (D. C. N. D. Ill.) 44 F.(2d) 637. It appears that after that decision Neet, Inc., which had made and sold the cream depilatory known as "Neet," which was held to infringe the patent, took a license from Donner. The defendant in 1931 began to make and sell a cream depilatory in accordance with a process which it learned from a former employee of Neet, Inc., who had been in charge of the manufacture of "Neet." The defendant's product, of which the plaintiff complains, is called "Sheer," and is the same thing as "Neet."

In order to reach a conclusion as to the proper disposition of this case, it is necessary to determine: (1) What Donner's alleged invention is; (2) the state of the prior art; (3) whether the alleged invention is sufficiently described in the patent; (4) whether the advance in the art made by Donner was the result of invention or mere mechanical skill; and (5) whether the defendant is an infringer.

### The Donner Invention.

The claimed invention relates to a depilatory for removing human hair. Its object is stated in the specifications to be the preparation of a depilatory in the form of a cream or paste by the incorporation of a depilating agent in an air-restraining base in

such manner that the finished depilatory or depilating cream or paste is permanent and stable and may be applied directly to the skin for the removal of hair with facility and safety. Donner points out that existing depilatories are in the form of powders, liquids, or lotions, and that their application is attended with inconvenience and waste. The powder depilatories must be mixed with water, are messy, and the material is likely to be wasted. Liquid depilatories are difficult to confine to a small area to be treated. Lotion depilatories, which are essentially imperfect suspensions of alkali and alkaline earth, sulfids, polysulfids, and sulfhydrates in water, are subject to the same objection. Donner states in his specifications: "My invention consists of a depilatory, the physical state of which is a plastic mass of tooth paste or cold cream like consistency, and thus overcomes all difficulties of application attendant upon the use of those mentioned above. It is permanent, complete, and handleable; it can be taken from the jar or tube in quantities as desired, and can be applied over an area such as is occupied by one or two hairs on a mole, or upon a surface as extensive as the entire face. Likewise it can be applied to surfaces such as the armpits, with grace and convenience. Furthermore, once placed in position upon the area to be depilated, the cream remains without danger of running or spreading until the hair is disintegrated." He further states that he has found that the sulfid depilatories in common use have consisted of sulfids, polysulfids, and sulfhydrates of alkali, alkaline earth, and earth metals in solution or suspension in water alone or in admixture with one another in various proportions and strengths; that in all of these the dissolved sulfhydrates constitute the active depilating agent; that those which are undissolved have little or no depilating power; and that, when the depilating solutions are exposed to air, chemical changes take place which impair or destroy the usefulness and safety of the depilatory. He also says: "In my invention I have overcome these difficulties by taking advantage of the air-restraining properties of colloids and colloid-like bodies, which are capable, when mixed with the depilating agent and any suitable vehicle, of producing a pasty or cream-like mass, in while the molecules of the depilating agent are permanently suspended, and which renders them proof against the substantial entrance of and interaction with air; thus guaranteeing their stability, and the permanence of the preparation. The colloids used, besides having the properties of adhesiveness and air-exclusion, are such that do not decompose the depilating sulfid or sulfhydrate solution." He states that he has found that the objectionable odors of hydrogen sulfid which have attended the sulfid depilatories can be avoided by securing pure solution and by thus eliminating the presence of free hydrogen sulfid.

After thus disclosing the objects of his invention in his specifications and the invention itself in general terms, he states:

"As an instance of manufacture I place a quantity of quicklime $(CaO)$ in a large vessel, and slake it by pouring upon it approximately 4 times its weight of water. The interaction of the water and lime result in the formation of a mass of calcium hydroxid $(Ca(OH)_2)$, thus: $CaO+H_2O=Ca(OH)_2$. To this calcium hydroxid mass I add sufficient water to bring it to the consistence of a thin magma; that is, about 10 parts of water to 1 of lime are used. This is strained through gauze or a wire sieve to remove extraneous or gritty matter, and then distributed in suitable vessels, preferably glass, preparatory to charging with hydrogen sulfid. I then pass a current of hydrogen sulfid gas through this slaked lime cream until the whole assumes an even pale blue color, after which the current of hydrogen sulfid is removed. This pale blue magma, consisting of calcium sulfid $(CaS)$, calcium hydroxid $(Ca(OH)_2)$, and a solution of calcium sulfhydrate $(Ca(SH)_2)$ and calcium hydroxy-sulfhydrate $(Ca(SH)OH)$ constitutes the depilating mixture, of which the calcium sulfhydrate solution is the principal depilating agent. When made in this manner the calcium sulfhydrate solution is generally saturated; that is, it contains approximately 7% of calcium sulfhydrate.

"In the process as above outlined the presence of an excess of hydrogen sulfid is carefully avoided. However, should the process of sulfuretization be carried too far and the product have a marked hydrogen sulfid odor, the excessive uncombined hydrogen sulfid may be removed by subjecting the sulfuret to the action of a low grade vacuum, or by the addition of a suitable excess of milk of lime $(Ca(OH)_2)$, as above stated.

"To any desired quantity of this depilating magma light calcined magnesia $(MgO)$ is added in sufficient quantity to make a pasty mass of about the consistence of a cold cream or tooth paste. If the magnesium oxid is substantially pure approximately 1 part of it to 5 parts by weight of the depilating magma is required to bring the mixture to this consistence. A small quantity of oil of rose-ger-

...nium is added to impart an odor to the mixture, (usually 1 cc. to 500 grams of the paste), and the whole is admixed until an even, homogenous paste is secured.

"The product is a smooth, velvety cream, of the density and consistence of a toothpaste, and is of a pale blue color. It is substantially free from sulfid odor, and is possessed, instead, of the fragrant odor of oil of rosegeranium, and is essentially soluble in and miscible with water in all proportions. It is permanent and stable in commercial containers (jars and collapsible tubes) at ordinary temperatures, and is of sufficient strength to effect the removal of hair from within 3 to 10 minutes from the time of its application, without irritation or injury to the skin.

"While I have thus described a preferred embodiment of my invention I do not wish to limit myself to the exact materials or proportions outlined in the preceding. A variety of materials of like or similar properties may be used in lieu of those described herein, without departing from the scope of my invention or the spirit of the appended claims."

He then states that other inert powdered substances which are nonreactive with the depilating solution may be used with the colloidal adhesive to increase the density of the product. He also points out that other colloids or colloid-like substances may be used in lieu of the light magnesium oxid to effect the adhesion of the component parts of the mixture and to protect it against air deterioration.

The patent contains seventeen claims. Those upon which the plaintiff relies are 1, 2, 3, 6, 7, 13, 14, 16, and 17. Claims 2, 3, and 7 are sufficient for the purpose of this opinion. They read as follows:

"2. A composition of matter comprising a depilatory mixture and a vehicle carrying the same, in the form of a finished, stable, depilatory cream."

"3. A composition of matter for the purpose specified, comprising a depilating agent incorporated in an air-restraining base."

"7. A composition of matter comprising a depilatory mixture and a colloid carrying the same, in the form of a finished, stable depilatory paste."

It seems reasonably plain that what Donner did was to show how a common liquid depilatory could be converted into a stable cream depilatory. Depilatories were old, but stable cream depilatories were new with Donner. By combining the old method of creating a depilating liquid or lotion with a colloid or colloid-like substance, Donner produced a process of incorporating the depilating liquid into a creamy mass which did not break down or separate, but which preserved the effectiveness of the depilating agent and did away with the obvious defects of such depilatories as were then known to the art.

The experts, who were called upon to testify at the trial, spent much time in discussion of colloids and colloid-like substances and the colloidal state, and, like most experts, were not in entire accord. But Donner refers to colloids and colloid-like substances, and his specifications make his meaning reasonably plain. As a practical matter, it would seem to make little difference whether a substance was a true colloid or whether it merely acted like a colloid. What Donner did was to point out and show that certain finely powdered materials, mixed with the depilating liquids known to the art, will hold those liquids in permanent suspension, much as a sponge will hold water.

### The Prior Art.

The prior art cited is substantially that which was before Judge Lindley and which he discussed in his opinion. It consists of formulas for making liquid or paste depilatories contained in various formularies in existence prior to the filing of the Donner application. One patent is referred to, which is the British patent to Lutje, No. 26,822. Specifically, the prior art references are: The Dispensatory of the United States of America (1858) p. 1491; The Dispensatory of the United States of America (1854) p. 1381; New Standard Formulary, p. 1001, No. IV (1912, 1916); The Era Formulary, p. 135; The Fenner Formulary, p. 1277; Askinson's formulas; and the British patent above referred to.

No useful object would be served by discussing these formulas either as anticipation of the Donner patent or as indicating that Donner's improvement lacks patentable novelty. The formulas are obviously all directed to the preparation of a liquid, a paste, or a lotion which will remove hair, and none of them attempts to point out any way of incorporating the depilating agent in an airrestraining base or in a suitable cream; and it is not claimed that any of the formulas will produce a cream similar to that which was produced by Donner. The pastes are unstable, and the liquid and solid elements separate. As was pointed out by Judge Lindley in his opinion, the Lutje patent is the nearest approach to Donner, but the record is clear that strict adherence to the teachings of Lutje does not produce the Donner cream

depilatory, but a paste depilatory which separates.

■ In order to be an anticipation of a United States patent, a foreign patent must disclose the invention in such full, clear, and exact terms as to enable any person skilled in the art to practice it without the necessity of experimentation. Donner v. Walgreen Co. et al. (D. C.) 44 F.(2d) 637, 640, supra; Seymour v. Osborne, 11 Wall. 516, 555, 20 L. Ed. 33; Hanifen v. Armitage (C. C.) 117 F. 845, 847; Permutit Co. v. Harvey Laundry Co. (C. C. A. 2) 279 F. 713, 718; General Electric Co. v. Hoskins Mfg. Co. (C. C. A. 7) 224 F. 464, 468; Carson v. American Smelting & Refining Co. (C. C. A. 9) 4 F.(2d) 463, 465.

The prior art references, with the possible exception of Lutje, go no further than to cover Donner's first step, namely, the preparation of the depilating agent by passing hydrogen sulfid through a mixture of water and lime, which process, of course, was old. While Lutje goes a step further, he does not reach the result secured by Donner, but merely advances a step toward the solution of the problem. It seems probable that Lutje was not seeking so much to obtain a stable paste or cream as to make a mixture which would protect the skin of the user from injury.

### Description of the Invention.

The statute (title 35, U. S. C. § 33 [35 USCA § 33], 38 Stat. 958) provides: "Before any inventor or discoverer shall receive a patent for his invention or discovery he shall * * * file in the Patent Office a written description of the same, and of the manner and process of making, constructing, compounding, and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains, or with which it is most nearly connected, to make, construct, compound, and use the same. * * *"

■ The rule is that if the description in the patent is such that one skilled in the art can follow it and produce the result which the patent claims, it is sufficiently certain. Mowry v. Whitney, 14 Wall. 620, 644, 20 L. Ed. 860; The Telephone Cases, 126 U. S. 1, 536, 8 S. Ct. 778, 31 L. Ed. 863; Seabury v. Am Ende, 152 U. S. 561, 566, 14 S. Ct. 683, 38 L. Ed. 553; Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 437, 22 S. Ct. 698, 46 L. Ed. 968; Expanded Metal Co. v. Bradford, 214 U. S. 366, 383, 29 S. Ct. 652, 53 L. Ed. 1034; Holland Furniture Co. v. Perkins Glue Co., 277 U. S. 245, 257, 48 S. Ct. 474, 72 L. Ed. 868; Schaum & Uhlinger, Inc., v. Copley-Plaza Operating Co. (D. C.) 260 F. 197, 203, 204, affirmed in (C. C. A. 1) 269 F. 140; R. H. Comey Co. v. Monte Christi Corp. (C. C. A. 3) 17 F.(2d) 910, 912; Sun Ray Gas Corp. v. Bellows-Claude Neon Co. (C. C. A. 6) 49 F.(2d) 886, 887; In re Pilling (Cust. & Pat. App.) 44 F.(2d) 878, 879; Stelos Co. v. Hosiery Motor-Mend Corp. (D. C.) 60 F.(2d) 1009, 1011; 1 Walker on Patents (6th Ed. 1929) § 217; 35 USCA § 33, note 32.

The same question was raised and determined by the Supreme Court in the case of Seabury v. Am Ende, 152 U. S. 561, 14 S. Ct. 683, 38 L. Ed. 553. The court said (pages 566, 567 of 152 U. S., 14 S. Ct. 683, 684):

"The first ground of defense relied on is that the patentee has failed to describe his invention in such full, clear, and exact terms as to enable persons reading the description of the invention to construct and use it; and it is contended that the strength of the boracic acid solution is not prescribed, nor the precise proportion of glycerine. In considering this objection, it must be remembered that the description is addressed to persons skilled in the art to which it relates. The solution of boracic acid is referred to, not as anything new, but as an article well known to druggists and physicians; and, when the patentee says that he 'prepares a solution of boracic acid in the usual manner,' he means as it has formerly and customarily been prepared. When he directs that a small proportion of glycerine shall be added, it is obvious that the quantity of the glycerine is to vary with the amount of cotton and boracic acid used, but that the merits of the invention will not depend on whether, in a given case, a little more or less glycerine is used. * * *

"We, therefore, agree with the court below in thinking that 'an intelligent chemist, setting out properly to combine the enumerated ingredients into which the cotton is to be immersed, and with which it is to be impregnated, could hardly go astray.' It is also to be observed, that neither the defendant, in making the infringing article, nor the several witnesses of eminence in the medical profession, who testified to the practical value of the patented dressing, seem to have had any difficulty in understanding and applying the description contained in the patent."

There is no testimony in the record that any one skilled in the art had the slightest difficulty in following Donner's specifications. The evidence is all to the contrary.

One of the plaintiff's experts testified: "I experienced no difficulty in understanding or following this disclosure of the Donner patent." Another expert witness for the plaintiff testified: "I have read and understand the Donner patent in suit. I have made two or three samples according to the directions of the patent and experienced no difficulty whatever in so doing, i. e., in making the paste that is described there." Still another expert, called by the plaintiff, said that he had had no difficulty in following the directions of the patent. The defendant produced no evidence that any one skilled in the art was unable to secure Donner's result by Donner's process as described in the patent.

We think there is no justification, under the circumstances, for holding the patent void for lack of a sufficient description of the invention.

### Patentable Novelty.

■ Obviously, if the problem which Donner solved was one which could have been solved by the ordinary chemist skilled in the art working toward the same end and under like conditions, what Donner did was not invention.

"It is but the display of the expected skill of the calling, and involves only the exercise of the ordinary faculties of reasoning upon the materials supplied by a special knowledge, and the facility of manipulation which results from its habitual and intelligent practice; and is in no sense the creative work of that inventive faculty which it is the purpose of the constitution and the patent laws to encourage and reward." Hollister v. Benedict & Burnham Mfg. Co., 113 U. S. 59, 73, 5 S. Ct. 717, 724, 28 L. Ed. 901. See Atlantic Works v. Brady, 107 U. S. 192, 200, 2 S. Ct. 225, 27 L. Ed. 438; Aron v. Manhattan Ry. Co., 132 U. S. 84, 90, 10 S. Ct. 24, 33 L. Ed. 272; Werk v. Parker, 249 U. S. 130, 133, 39 S. Ct. 197, 63 L. Ed. 514; Concrete Appliances Co. v. Gomery, 269 U. S. 177, 185, 46 S. Ct. 42, 70 L. Ed. 222; Saranac Automatic Machine Corp. v. Wirebounds Patents Co., 282 U. S. 704, 713, 51 S. Ct. 232, 75 L. Ed. 634; 1 Walker on Patents (6th Ed. 1929) § 62.

In determining whether what Donner accomplished, described, and claimed, constituted invention, well-established rules must be kept in mind.

■ The issuance of a patent is prima facie evidence of both novelty and utility. Lehnbeuter v. Holthaus, 105 U. S. 94, 96, 26 L. Ed. 939; Seymour v. Osborne, 11 Wall. 516, 538, 20 L. Ed. 33; Smith v. Goodyear Dental

Vulcanite Co., 93 U. S. 486, 498, 23 L. Ed. 952; Cantrell v. Wallick, 117 U. S. 689, 695, 6 S. Ct. 970, 29 L. Ed. 1017; Gandy v. Main Belting Co., 143 U. S. 587, 595, 596, 12 S. Ct. 598, 36 L. Ed. 272; Morgan v. Daniels, 153 U. S. 120, 123, 14 S. Ct. 772, 38 L. Ed. 657; Diamond Rubber Co. of N. Y. v. Consolidated Rubber Tire Co., 220 U. S. 428, 434, 31 S. Ct. 444, 55 L. Ed. 527; Buchanan v. Wyeth Hdwe. & Mfg. Co. (C. C. A. 8) 47 F.(2d) 704, 706; Graham Paper Co. v. International Paper Co. (C. C. A. 8) 46 F.(2d) 881, 885; Tropic-Aire, Inc., v. Sears, Roebuck & Co. (C. C. A. 8) 44 F.(2d) 580, 591, certiorari denied 282 U. S. 904, 51 S. Ct. 217, 75 L. Ed. 796; Zip Mfg. Co. v. Pusch (C. C. A. 8) 2 F.(2d) 828, 831; Acme Foundry & Mach. Co. v. Oil Well Improvements Co. (C. C. A. 8) 2 F.(2d) 530, 531, certiorari denied 268 U. S. 704, 45 S. Ct. 639, 69 L. Ed. 1167; 1 Walker on Patents (6th Ed.) § 116.

■ When one attacks a patent, he must make good his attack with reasonable clearness. The burden of proof is upon him and every reasonable doubt will be resolved against him. Coffin v. Ogden, 18 Wall. 120, 124, 21 L. Ed. 821; Smith v. Goodyear Dental Vulcanite Co., 93 U. S. 486, 498, 23 L. Ed. 952; Cantrell v. Wallick, 117 U. S. 689, 695, 6 S. Ct. 970, 29 L. Ed. 1017; Morgan v. Daniels, 153 U. S. 120, 123, 14 S. Ct. 772, 38 L. Ed. 657: Buchanan v. Wyeth Hdwe. & Mfg. Co. (C. C. A. 8) 47 F.(2d) 704, 706; Zip Mfg. Co. v. Pusch (C. C. A. 8) 2 F.(2d) 828, 831: Johns-Manville Co. v. R. V. Aycock Co. (D C.) 45 F.(2d) 817, 819; General Motors Corp. v. Leer Auto Supply Co. (C. C. A. 2) 60 F.(2d) 902, 904; C. N. Weaver, Inc., v. American Chain Co. (C. C. A. 9) 9 F.(2d) 372, 380, certiorari denied 273 U. S. 699, 47 S. Ct. 94, 71 L. Ed. 847.

■ While commercial success cannot convert mechanical skill into invention, it may, in doubtful cases, be some evidence of invention. Tropic-Aire, Inc., v. Sears, Roebuck & Co. (C. C. A. 8) 44 F.(2d) 580, 591, 592, and numerous cases cited, certiorari denied 282 U. S. 904, 51 S. Ct. 217, 75 L. Ed. 796; Buchanan v. Wyeth Hdwe. & Mfg. Co. (C. C. A. 8) 47 F.(2d) 704, 706; Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U. S. 45, 56, 43 S. Ct. 322, 67 L. Ed. 523; John E. Thropp's Sons' Co. v. Seiberling, 264 U. S. 320, 330, 44 S. Ct. 346, 68 L. Ed. 708; Trico Products Corp. v. Apco-Mossberg Corp. (C. C. A. 1) 45 F.(2d) 594, 598; 1 Walker on Patents (6th Ed.) § 126.

■ Simplicity alone cannot be relied upon as indicating that an improvement is the re-

sult of mechanical skill rather than inventive genius. Diamond Rubber Co. of N. Y. v. Consol. Rubber Tire Co., 220 U. S. 428, 434, 31 S. Ct. 444, 55 L. Ed. 527; New York Scaffolding Co. v. Whitney (C. C. A. 8) 224 F. 452, 457; Trane Co. v. Nash Engineering Co. (C. C. A. 1) 25 F. (2d) 267; Jensen-Salsbery Laboratories v. Salt Lake Stamp Co. (C. C. A. 8) 28 F. (2d) 99, 101.

The advantages of a stable cream depilatory were obvious a long time prior to Donner. There was a demand for such a product. No one completely solved the problem before Donner. The evidence shows that the manufacturer of "Neet," which had been selling a depilatory for many years, had been constantly endeavoring to improve the product and to produce the depilatory in the form of a cream, and had, about the time that Donner obtained his patent, employed a consulting chemist for that purpose. This chemist testified upon the trial that he had discovered that by grinding the lime hydrate, which was used for the preparation of "Neet," a more stable cream than any theretofore produced was made. He regarded what he had discovered as invention before he found that he had been anticipated by Donner.

The defendant's expert testified with regard to the Donner process as follows: "Now, the magnesium hydroxid absorbs about one and one-half molecules, as the colloidal chemists have determined, this is really the beautiful thing about this patent, the using of this product for it has also the property of absorbing gases and absorbing the hydrogen sulfid gas and makes a preparation of this kind far superior to ordinary calcium hydroxide, and also the magnesium hydroxid has the repellant action on the paste and prevents the exuding of the hydrogen sulfid and also modifies the capillary traction very greatly, as testified, so it is really an active colloidal proposition, magnesium hydroxid, we admit it."

There seems to be very little in the record upon which to base a conclusion that what Donner did was old or that there was anything in the prior art which pointed the way to the result which he accomplished. The court below was of the opinion that the thickening of a liquid depilatory into a cream was in principle the same as making a thin batter into a thick batter by the addition of more flour. If these liquid depilatories were inert and inactive and could as readily be incorporated into a cream as water or other inert and inactive liquids, the situation would be very different. It is evident that a conversion of

a liquid depilatory into a satisfactory depilating cream was not a simple problem. The liquids are chemically active and readily break down. If mixed with powdered substances with which they react chemically, the desired result is not produced. If they are absorbed, instead of held in suspension, by the medium in which they are carried, the product loses its effectiveness as a depilatory. In order to make a stable cream depilatory, it is necessary to use such substances as would produce no disadvantageous chemical change in the depilating agent and as would carry it in suspension and would, when the finished product was applied to the skin, permit the depilating agent to attack the hair to the same extent as though it was in liquid form. It now appears that what Donner did was a very simple thing, but the practical effect of what he did was to produce a new and useful result and product and to solve an old problem.

Taking into consideration the rules which we have referred to, we are not prepared to say that Donner's improvement in depilatories did not rise to the dignity of an invention.

We think that the case of Seabury v. Am Ende, 152 U. S. 561, 14 S. Ct. 683, 38 L. Ed. 553, supra, is in point. Prior to the patent there involved, boracic acid had been used, in liquid form or in powder form, as a preservative or as a dressing for wounds. The object to be preserved had to be immersed in a solution, if the liquid form was used, or completely covered with the powder if powder was used. The invention consisted in saturating cotton fibre with boracic acid and glycerine and then applying the product to the material to be preserved or the wound to be dressed. The cotton constituted a filter preventing germs from passing through; the acid was a preservative; and the glycerine rendered the cotton hygroscopic, aiding in the diffusion of the acid and in the preservative effect of the cotton. The court held it to be invention, saying (page 567 of 152 U. S., 14 S. Ct. 683, 685): "It is, indeed, true that the patentee did not claim to have been the first to suggest the use of cotton fibre as a means of excluding germs from wounds or from the article to be protected. Nor did he claim to have first discovered the antiseptic qualities of boracic acid or the hygroscopic property of glycerine. But the patentee was the first to perceive that, by combining these articles in the manner he pointed out, there would be formed a convenient and permanent dressing with the desirable qualities of the

several constituents. The complainant's evidence satisfactorily shows that, in such a dressing, the cotton acts as a screen to exclude germs, and as a vehicle to hold the other ingredients; that the boracic acid possesses marked antiseptic qualities, but is liable, if used alone, to dry on the cotton and to form crystals, which impair the antiseptic qualities of the acid, and which mechanically scratch or irritate the sensitive surface of a wound; and that the glycerine, owing to its property of absorbing moisture from the atmosphere, keeps the boracic acid from hardening or crystallizing, and, besides, adds somewhat to the healing and preservative power of the dressing."

In our case, Donner did not claim to have discovered depilating agents, nor did he claim to have discovered that colloids or colloid-like substances were capable of holding liquids in suspension. He was the first to perceive that certain colloids or colloid-like substances were capable of acting as a vehicle to hold the depilating agents in stable suspension and thus to produce a more satisfactory depilatory than any yet offered to the public.

See, also, Holland Furniture Co. v. Perkins Glue Co., 277 U. S. 245, 48 S. Ct. 474, 72 L. Ed. 868; Zip Mfg. Co. v. Pusch (C. C. A. 8) 2 F.(2d) 828; Atlantic Giant-Powder Co. v. Mowbray (C. C.) Fed. Cas. No. 624; Atlantic Giant-Powder Co. v. Parker (C. C.) Fed. Cas. No. 625; Atlantic Giant-Powder Co. v. Rand (C. C.) Fed. Cas. No. 626; Taylor v. Archer (C. C.) Fed. Cas. No. 13,778; United States & Foreign Salamander Felting Co. v. Merrimack Mfg. Co. (C. C.) Fed. Cas. No. 16,789; Electrical Accumulator Co. v. Julien Electric Co. (C. C.) 38 F. 117; A. B. Dick Co. v. Belke & Wagner Co. (C. C.) 86 F. 149; King v. Anderson (C. C.) 90 F. 500; Rumford Chemical Works v. New York Baking Powder Co. (C. C. A. 2) 134 F. 385; Chadeloid Chemical Co. v. Frank S. De Ronde Co. (C. C.) 146 F. 988; Chadeloid Chemical Co. v. Daxe Varnish Co. (C. C.) 180 F. 1004; Chadeloid Chemical Co. v. F. W. Thurston Co. (D. C.) 220 F. 685; Chadeloid Chemical Co. v. Wilson Remover Co. (C. C. A. 2) 224 F. 481; Union Carbide Co. v. American Carbide Co. (C. C. A. 2) 181 F. 104; Parke-Davis & Co. v. H. K. Mulford Co. (C. C.) 189 F. 95; Kupper v. Westinghouse Electric & Mfg. Co. (D. C.) 212 F. 184, affirmed (C. C. A. 3) 222 F. 1023; Polygon Products Corp. v. Kant-Rust-Products Corp. (C. C. A. 3) 292 F. 569; United States Industrial Chemical Co. v. Theroz Co. (C. C. A. 4) 25 F.(2d) 387.

## Infringement.

That the defendant's end product is substantially the same as Donner's is apparent. The process used is not identical with that of Donner. Donner prepares his depilating agent before mixing with it his colloid or colloid-like material. The defendant, instead of using calcined magnesia to make the cream depilatory, uses ultra-fine hydrate of lime. This lime is mixed with water to form a cream before any hydrogen sulfid is infused. After the mixture is made, hydrogen sulfid is forced through the mass, which is agitated, and the hydrogen sulfid is absorbed by the water, which is held in suspension in the mass. Thus the difference between the two processes is that Donner forms his depilating agent before incorporating it into the vehicle which holds it in suspension, while the defendant prepares the vehicle which holds lime water in suspension, and then forces the hydrogen sulfid through it, which turns the lime water into the depilating agent.

The defendant argues that to add sufficient ultra-fine lime hydrate to form a cream is doing nothing more than to follow the teachings of the prior art; but, in our opinion, the defendant does nothing more than follow the teachings of Donner, because that portion of the lime hydrate which is not dissolved by the water constitutes simply the vehicle which holds the liquid depilatory in suspension in the same way that the calcined magnesia of Donner holds his liquid in suspension.

It is interesting to note that the manufacturer, from whom the defendant procures its ultra-fine hydrate of lime, prior to the time of Donner produced no such product, and there is nothing to indicate that any of the prior art referred to any such product. It is obvious that ordinary hydrate of lime will not produce a stable cream depilatory, and that it is not because it is hydrate of lime that the result is a stable cream, but because the material is in finely powdered form, its particles being approximately the same size as the particles of the material used by Donner to produce his cream depilatory.

Walker, in his work on Patents (6th Ed. 1929) §§ 415, 426, says:

"It is therefore safe to define an equivalent as a thing which performs the same function, and performs that function in substantially the same manner, as the thing of which it is alleged to be an equivalent."

"Substitution of one equivalent for another, in a patented composition of matter, is generally as ineffectual to avoid infringe-

224

ment as is like substitution in a machine. An equivalent for one ingredient of a patented composition of matter is anything which in the composition performs the same function as that ingredient."

See, also, Sanitary Refrigerator Co. v. Winters, 280 U. S. 30, 41, 42, 50 S. Ct. 9, 74 L. Ed. 147; McKays Co. v. Penn Electric Switch Co. (C. C. A. 8) 60 F.(2d) 762, 766; Kinloch Tel. Co. v. Western Electric Co. (C. C. A. 8) 113 F. 652, 655; H. Tibbe & Sons Mfg. Co. v. Lamparter (C. C.) 51 F. 763; H. Tibbe & Sons Mfg. Co. v. Missouri Cob-Pipe Co. (C. C.) 62 F. 158; Edison Electric Light Co. v. Boston Incandescent Lamp Co. (C. C.) 62 F. 397; Read Holliday & Sons v. Schulze-Berge (C. C.) 78 F. 493; American Sulphite Pulp Co. v. Howland Falls Pulp Co. (C. C. A. 1) 80 F. 395; American Sulphite Pulp Co. v. De Grasse Paper Co. (C. C. A. 2) 157 F. 660; Munising Paper Co. v. American Sulphite Pulp Co. (C. C. A. 6) 228 F. 700; Welsbach Light Co. v. Sunlight Incandescent Gas Lamp Co. (C. C.) 87 F. 221; Treibacher-Chemische, etc., v. Roessler & Hasslacher Chemical Co. (C. C. A. 2) 219 F. 210; Polygon Products Corp. v. Kant-Rust Products Corp. (C. C. A. 3) 292 F. 569, 572; Bird v. Sears, Roebuck & Co. (C. C. A. 2) 299 F. 574.

Our conclusion is that the Donner patent is valid and infringed.

The decree is reversed, and the case remanded, with directions to enter a decree for the plaintiff and for further proceedings not inconsistent with this opinion.